**Casey EXTON d/b/a Outlaw Biker Stable, Plaintiff,**

v.

**OUR FARM, INC., Defendant.**

**Civil Action No. 96–1725 (AJL).**

United States District Court, D. New Jersey.

Sept. 10, 1996.

Steven L. Kessel, Drazin & Warshaw, P.C., Red Bank, NJ, for Plaintiff.

Richard M. Mackowsky, Cozen and O'Connor, Westmont, NJ, for Defendant.

## OPINION

LECHNER, District Judge.

This is an action by Casey Exton d/b/a Outlaw Biker Stable ("Exton") against Our Farm, Inc. ("Our Farm"). Exton filed a complaint (the "Complaint") on 22 April 1996. The Complaint alleges subject matter jurisdiction under 28 U.S.C. § 1332, Complaint, ¶ 5; it does not allege Federal question jurisdiction nor does it allege venue is proper in the District Court for the District of New Jersey.

1. At a status conference, held 24 June 1996, Our Farm's counsel indicated his intent to file a motion to transfer the instant action to the U.S. District Court for the Eastern District of Pennsylvania. The parties were then directed to submit briefs concerning the propriety of transfer.

2. Exton submitted: Plaintiff's Brief in Opposition to Defendant's Motion (the "Opposition Brief"); Declaration of Casey Exton in Opposition to Motion to Dismiss for Lack of Jurisdiction (the "Exton Decl.") attaching exhibits. Exton also submitted the Supplemental Declaration in Opposition to Motion to Dismiss for Lack of Jurisdiction of Steven Kessel (the "Kessel Decl."). The Kessel Decl. failed to raise relevant issues not already under consideration by the court. Further, it is noted the Kessel Decl. was

Currently before the court is a motion by Our Farm to dismiss the Complaint for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), and for improper venue, pursuant to Federal Rule of Civil Procedure 12(b)(3).[1] Our Farm alternatively seeks an order transferring the instant action to the United States District Court for the Eastern District of Pennsylvania, pursuant to 28 U.S.C. §§ 1404 and 1406.[2] For the reasons set forth below, the instant action is transferred to the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1631.

*Facts*

### A. *Parties*

Exton is a citizen domiciled in the State of New Jersey. Complaint, ¶ 1. Exton conducts his business under the name "Outlaw Biker Stable." *Id.*, ¶ 1. During the time relevant to the Complaint, Exton was the owner of a racehorse named Distinctive Hat ("Distinctive Hat"). *Id.*, ¶ 6.

Our Farm is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Worcester, Pennsylvania. Gambone Aff., ¶ 5.

### B. *Background*

As indicated, Exton owned a racehorse named Distinctive Hat. Complaint, ¶ 6. Distinctive Hat was allegedly a "superior race horse" which "raced a substantial part of its racing career in New Jersey." *Id.*, ¶ 8. Distinctive Hat's "last start was in a $200,-

submitted in violation of the procedures set forth in Appendix N of the General Rules for the District of New Jersey.

Our Farm submitted: Defendant's Memorandum of Law in Support of its Motion to Dismiss or, in the alternative, to Transfer Venue (the "Moving Brief"); Affidavit of Raymond Gambone (the "Gambone Aff."); Defendant's Memorandum of Law in Reply to Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss or, in the alternative, to Transfer Venue. Our Farm also submitted Defendant Our Farm's Reply to Plaintiff Casey Exton d/b/a Outlaw Biker Stable's Supplemental Declaration on Behalf of the Plaintiff in Opposition to Defendant's Motion to Dismiss.

000.00 'Grade 3' Turf Stake." *Id.* In 1995, prior to its last race, Distinctive Hat had nine starts with five first place, three second place and one third place finishes. *Id.*, ¶ 9. Distinctive Hat's lifetime earnings were allegedly $220,000.00. *Id.* Exton alleges Distinctive Hat was a valuable racehorse and had "unlimited future racing potential." *Id.*, ¶ 10.

Our Farm operates a horse farm in Worcester Pennsylvania and provides "facilities and services involving the boarding, breeding, training, treatment of and rehabilitation of thoroughbred, quarterhorses and other horses." Gambone Aff., ¶ 4.

Exton entrusted Distinctive Hat and at least seven other horses to Danny Lopez ("Lopez"), a racehorse trainer whose business is located in New Jersey. Exton Decl., ¶ 5. Exton describes Lopez as a "fixture on the New Jersey racing scene." Opposition Brief at 1. Exton allowed Lopez to make the arrangements for the stabling of the horses. Exton Decl. ¶ 5.

In late November or early December 1995, Lopez placed Distinctive Hat in the care of Our Farm at its farm in Pennsylvania. Complaint, ¶ 12. Lopez made the arrangements with Our Farm to stable Distinctive Hat and seven other of Exton's horses without Exton's knowledge.[3] Exton Decl., ¶ 5. "All meetings, communications and instructions concerning the care and treatment of 'Distinctive Hat' occurred in Pennsylvania." Gambone Aff., ¶ 12. Lopez gave all "orders and instructions" concerning the care and treatment of Distinctive Hat directly to Our Farm at its facility in Pennsylvania. *Id.*, ¶ 14.

While Distinctive Hat was at Our Farm, Raymond Gambone ("Gambone"), the owner of Our Farm, applied a "red mercury blister" mixed with "reducine" to the horse's "hocks." Gambone Aff., ¶ 11. Exton describes the procedure performed by Gambone as placing a splint "on the inside of the joint of the horse's rear legs." Opposition Brief at 1. Lopez purchased the reducine used in the procedure. Exton Decl., ¶ 7. After Gambone applied the "red mercury blister," Distinctive Hat allegedly "developed a loss of skin and an infection that became so extensive the horse had to be destroyed." Opposition Brief at 1.

### C. *Our Farm's Contacts with New Jersey*

Exton argues personal jurisdiction may be asserted over Our Farm because "Our Farm entered into a business relationship with a New Jersey resident." Opposition Brief at 4. Exton further argues:

> Our Farm has a substantial pattern of using New Jersey facilities in connection with other areas of its horse business. It races his (sic) horses extensively at New Jersey tracks, uses the services of New Jersey trainers for those races, does a substantial amount of boarding business with at least one New Jersey trainer ... and advertises its services in racing magazines of general circulation which can reasonably be expected to generate New Jersey business. These facts demonstrate a systematic series of contacts concerning both the running and boarding of horses that the defendant has in New Jersey.

Opposition Brief at 5.

Exton submitted a clipping from the 15 May 1995 issue of The Blood–Horse ("The Blood–Horse"), a weekly publication of the Thoroughbred Owners and Breeders Association. Exton Decl., Exhibit C. The Blood–Horse is a racing magazine of "general circulation," having some magazine subscribers who are New Jersey residents. Exton Decl., ¶ 8 & Exhibit C. Our Farm advertised its business in The Blood–Horse including, boarding, breaking and training and sales preparation. *Id.* It also advertised its racing stable, "stallions," "Hunters/Jumpers" and that it could provide "Layups." *Id.*

Exton also argues Our Farm regularly races its racehorses in New Jersey. Opposition Brief at 5. He states that between January 1, 1992 and June 16, 1996, Our Farm raced its horses fifty-nine times at race parks in New Jersey. Exton Decl., ¶ 3 & Exhibit A (Racing History for Our Farm from 1 Janu-

---

3. The Complaint alleges Exton placed Distinctive Hat in the care of Our Farm. Complaint, ¶ 12. The parties, however, appear to agree Lopez made all arrangements with Our Farm concerning the boarding and care of Distinctive Hat. Gambone Aff., ¶ 14; Exton Decl., ¶¶ 1, 5.

ary 1992 to 16 June 1996 (the "Racing History"), prepared by Bloodstock Research Information Services, Inc.). The Racing History indicates Our Farm used New Jersey trainers when racing its horses in New Jersey. *Id.,* ¶ 4.

Our Farm responds it "has no offices, employees, real or personal property in New Jersey." Gambone Aff., ¶ 6. Our Farm further states it does not regularly conduct business in New Jersey, Gambone Aff., ¶ 6, nor does it "advertise or solicit business specifically in New Jersey." *Id.,* ¶ 9. Our Farm concedes it races horses in New Jersey "on an infrequent basis," Gambone Aff., ¶ 8, and does not deny it advertises in "racing magazines of general circulation," although it states it does not specifically target the New Jersey market with its advertisements. Gambone Aff., ¶ 9.

Our Farm argues its business activities do not bear a sufficient connection with this forum to give rise to personal jurisdiction. Moving Brief at 7–11. Our Farm further argues venue is improperly before the court because it "resides" only in Pennsylvania which is where the events giving rise to the instant action occurred. *Id.* at 1–2.

### D.  *The Complaint*

As indicated, Exton alleges diversity jurisdiction. The Complaint was served on Our Farm in Pennsylvania. Gambone Aff., ¶ 15. The Complaint alleges Our Farm "held itself ... [out] to the public and to [Exton] as being skilled, careful and diligent in the care, maintenance (sic) and treatment of thoroughbred and quarter horses." Complaint, ¶ 11. The Complaint further alleges:·

13.  Notwithstanding the duty imposed on the defendant to exercise such reasonable skill and care as is so usually required in the care, maintenance of Thoroughbreds and Quarter horses[,] ... Our Farm, through their (sic) agents, servants and/or employees negligently, carelessly and without due care applied red mercury blister to "Distinctive Hat's" hocks in a manner which was inconsistent with the standard practice and which was negligent which negligence was the proximate cause of the severe damage to "Distinctive Hat" result-

ing in substantial swelling an inability to move.

14.  Despite substantial medical treatment and surgery[,] "Distinctive Hat" could not be cured.  The red mercury blister was applied in a manner contrary to the standards of accepted procedures thereby causing permanent and irreparable damage to "Distinctive Hat" thereby ending his racing career and ultimately causing the horse to euthanized.

Complaint, ¶¶ 13–14.

### *Discussion*

### A.  *Personal Jurisdiction*

A Federal court has jurisdiction over a nonresident defendant to the extent authorized by the law of the state in which the court sits.  Fed.R.Civ.P. 4(e); *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 108, 108 S.Ct. 404, 411, 98 L.Ed.2d 415 (1987); *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 150 (3d Cir.1996); *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.,* 5 F.3d 28, 31 (3d Cir.1993); *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 481 (3d Cir.1993); *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros., Inc.,* 983 F.2d 551, 554 (3d Cir.1993); *North Penn Gas Co. v. Corning Nat. Gas Corp.,* 897 F.2d 687, 689 (3d Cir.), *cert. denied,* 498 U.S. 847, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990); *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 436 (3d Cir.1987); *Telesis Mergers & Acquisitions, Inc. v. Atlis Federal SVCS, Inc.,* 918 F.Supp. 823, 829–30 (D.N.J.1996); *Romero v. Argentinas,* 834 F.Supp. 673, 678 (D.N.J.1993).

Federal ·courts sitting in New Jersey may assert personal jurisdiction over a nonresident to the extent authorized by New Jersey law.  *Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 144–45 (3d Cir.), *cert. denied,* 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *Dent v. Cunningham,* 786 F.2d 173, 175 (3d Cir.1986); *Telesis,* 918 F.Supp. at 829–30; *Romero,* 834 F.Supp. at 679; *Database America, Inc. v. Bellsouth Advertising & Pub. Corp.,* 825 F.Supp. 1195, 1207 (D.N.J. 1993); *Apollo Technologies Corp. v. Centro-*

*sphere Indus. Corp.,* 805 F.Supp. 1157, 1181 (D.N.J.1992); *AT & T v. MCI,* 736 F.Supp. 1294, 1301 (D.N.J.1990); *Eason v. Linden Avionics, Inc.,* 706 F.Supp. 311, 319 (D.N.J. 1989).

The New Jersey Long Arm Rule permits the assertion of *in personam* jurisdiction as far as is constitutionally permissible under the Fourteenth Amendment. N.J.Court Rule 4:4–4; *Carteret,* 954 F.2d at 145; *Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 698 (3d Cir.1990); *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 284 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981); *Eaton Corp. v. Maslym Holding Co.,* 929 F.Supp. 792, 795–96 (D.N.J. 1996); *Charles Gendler & Co. v. Telecom Equip. Corp.,* 102 N.J. 460, 469, 508 A.2d 1127 (1986) (citing *Avdel Corp. v. Mecure,* 58 N.J. 264, 268, 277 A.2d 207 (1971)).

Pursuant to the Fourteenth Amendment, personal jurisdiction exists where the plaintiff demonstrates the defendant has sufficient "minimum contacts" with the forum state.

> The first step in a minimum-contacts analysis ... is to determine whether the defendant has sufficient contacts with the forum state. The second step is to evaluate those contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"

*Charles Gendler,* 102 N.J. at 472, 508 A.2d 1127 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)); *see also Vetrotex,* 75 F.3d at 150; *Mellon Bank (East) PSFS v. Farino,* 960 F.2d 1217, 1221–1222 (3d Cir. 1992); *Lebel v. Everglades Marina, Inc.,* 115 N.J. 317, 322, 558 A.2d 1252 (1989); *Ruetgers–Nease Chem. Co. v. Firemen's Ins.,* 236 N.J.Super. 473, 477, 566 A.2d 227 (App.Div. 1989).

In measuring the sufficiency of minimum contacts for *in personam* jurisdiction, a court must focus upon " 'the relationship among the defendant, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)); *Romero,* 834 F.Supp. at 679; *Database America,* 825 F.Supp. at 1208; *Apollo,* 805 F.Supp. at 1183; *Giangola v. Walt Disney World Co.,* 753 F.Supp. 148, 155 (D.N.J.1990); *Lebel,* 115 N.J. at 323, 558 A.2d 1252.

### 1. *Minimum Contacts*

Because Our Farm has raised a jurisdictional objection, Exton bears the burden of demonstrating Our Farm's contacts with New Jersey are sufficient to support personal jurisdiction. *Grand Entertainment,* 988 F.2d at 482; *Mellon Bank,* 960 F.2d at 1223; *Carteret,* 954 F.2d at 146; *North Penn Gas,* 897 F.2d at 689; *Gehling v. St. George's Sch. of Medicine, Ltd.,* 773 F.2d 539, 542 (3d Cir.1985); *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir.1984); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,* 723 F.2d 357, 362 (3d Cir.1983); *Romero,* 834 F.Supp. at 679; *Database America,* 825 F.Supp. at 1208; *Apollo,* 805 F.Supp. at 1182. Exton "must sustain [his] burden of proof through 'sworn affidavits or other competent evidence.'" *North Penn Gas,* 897 F.2d at 689 (quoting *Stranahan Gear Co. v. NL Indus.,* 800 F.2d 53, 58 (3d Cir.1986)).

Exton may satisfy his burden by either demonstrating "the particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that [Our Farm] has 'continuous and systematic' contacts with the forum state ('general jurisdiction)." *Provident Nat'l Bank,* 819 F.2d at 437 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 416, 104 S.Ct. 1868, 1872, 1873, 80 L.Ed.2d 404 (1984)); *see Romero,* 834 F.Supp. at 679; *Database America,* 825 F.Supp. at 1208; *Apollo,* 805 F.Supp. at 1182; *Giangola v. Walt Disney World Co.,* 753 F.Supp. 148, 154 (D.N.J.1990). "When the cause of action arises out of the defendant's contacts with the forum state, it is more likely that the contacts will subject the defendant to the jurisdiction of the forum than if the cause arises from unrelated contacts." *Charles Gendler,* 102 N.J. at 471, 508 A.2d 1127.

■ To establish either general or specific jurisdiction, Exton must show Our Farm's contacts with New Jersey are shaped by purposeful conduct making it reasonable for Our Farm to anticipate being haled into court there. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283, *reh'g denied,* 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958); *North Penn Gas,* 897 F.2d at 690; *Romero,* 834 F.Supp. at 679; *Database America,* 825 F.Supp. at 1208; *Apollo,* 805 F.Supp. at 1182; *Lebel,* 115 N.J. at 323, 558 A.2d 1252. These contacts must have a basis in "some act by which [Our Farm] purposely avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240. The absence of a "physical presence" in the state is not determinative for jurisdictional purposes. *Burnham v. Superior Court of California,* 495 U.S. 604, 618, 110 S.Ct. 2105, 2114, 109 L.Ed.2d 631 (1990) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)); *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (same); *Charles Gendler,* 102 N.J. at 469–70, 508 A.2d 1127 (same).

The " 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183 (citations omitted); *Romero,* 834 F.Supp. at 680; *Database America,* 825 F.Supp. at 1208; *Apollo,* 805 F.Supp. at 1183; *Giangola,* 753 F.Supp. at 155; *AT & T,* 736 F.Supp. at 1302–03; *Lebel,* 115 N.J. at 323, 558 A.2d 1252.

■ Burger King indicates when jurisdiction based upon "purposeful availment" is proper:

Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum state. Thus where the defendant "deliberately" has engaged in significant activities within

a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation on that forum as well.

*Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84 (emphasis in original, citations omitted); *see North Penn Gas,* 897 F.2d at 690; *Database America,* 825 F.Supp. at 1209.

■ Once it is clear a defendant has minimum contacts with the forum, "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160). By exercising the privilege of conducting activities within the forum state, a defendant is put on notice it is subject to suit there. *Id.* at 472, 105 S.Ct. at 2181. The fairness of exercising jurisdiction over a defendant results from a reciprocal relationship between the defendant and the forum state. *Eason,* 706 F.Supp. at 320.

### 2. *Specific Jurisdiction*

"Under a specific jurisdiction analysis, in order for the exercise of personal jurisdiction to be proper, the cause of action must arise from or be related to" a defendant's contacts with the forum. *Sunbelt Corp.,* 5 F.3d at 32; *see Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. at 1872 n. 8, *Vetrotex,* 75 F.3d at 151; *North Penn Gas,* 897 F.2d at 690; *Provident Nat'l Bank,* 819 F.2d at 437; *Database America,* 825 F.Supp. at 1212; *Apollo,* 805 F.Supp. at 1182; *Giangola,* 753 F.Supp. at 154; *AT & T,* 736 F.Supp. at 1302.

■ Specific jurisdiction requires not only the cause of action arise from the defendant's forum-related activities, but also that those forum-related activities rise to the level of minimum contacts with the state, such that the defendant should reasonably anticipate being haled into court there. *North Penn Gas,* 897 F.2d at 690 (citing *World–Wide*

*Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567); *Database America,* 825 F.Supp. at 1212; *Apollo,* 805 F.Supp. at 1182; *Giangola,* 753 F.Supp. at 154–55.

■ Once it has been decided minimum contacts exist, the Supreme Court has established "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160); *see also Charles Gendler,* 102 N.J. at 472, 508 A.2d 1127. These factors include: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564); *see also Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987); *Charles Gendler,* 102 N.J. at 472, 508 A.2d 1127.

■ In the instant action, Exton predicates his claim of specific personal jurisdiction on the business relationship between Our Farm and Lopez.

Our Farm entered into a business relationship with a New Jersey resident, Danny Lopez, involving horses which it knew or ought to have known were owned by New Jersey residents[.] This business relationship encompassed the specific horse that is the subject of this litigation. [Our Farm] purposefully directed his (sic) activities towards a New Jersey resident in order to attract New Jersey business. These facts are sufficient to support a finding of specific jurisdiction.

Opposition Brief at 4.

Exton's argument is without merit. As the Supreme Court explained in *Burger King:* "If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." 471 U.S. at 478, 105 S.Ct. at 2185. The *Burger King* Court held the Due Process Clause requires "that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Id.* at 472, 105 S.Ct. at 2182 (quoting *Shaffer,* 433 U.S. at 218, 97 S.Ct. at 2587 (Stevens, J., concurring)). Absent consent, the "fair warning" condition requires the defendant to purposefully direct its activity toward forum residents, and the injuries at issue in the litigation must relate to the defendant's forum-related activity. *Id.* (citing *Keeton,* 465 U.S. at 774, 104 S.Ct. at 1478; *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872).

As indicated, moreover, specific jurisdiction requires the cause of action arise from a defendant's forum-related activities. *Vetrotex,* 75 F.3d at 151; *Sunbelt Corp.,* 5 F.3d at 32; *North Penn,* 897 F.2d at 690; *Mellon Bank,* 983 F.2d at 555; *Dollar Savings Bank v. First Security Bank of Utah,* 746 F.2d 208, 211 (3rd Cir.1984); *Romero,* 834 F.Supp. at 681; *see Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. at 1872 n. 8. The events giving rise to the instant case all occurred in Pennsylvania. The agreement between Lopez and Our Farm to stable Distinctive Hat was made in Pennsylvania. Exton Decl., ¶ 5. The alleged act of negligence also took place in Pennsylvania. Complaint, ¶ 13. Accordingly, specific jurisdiction is absent.

### 3. *General Jurisdiction*

■ General jurisdiction exists where the defendant has continuous and systematic contacts with the state which need not be related to the subject matter of the lawsuit. *Provident Nat'l Bank,* 819 F.2d at 437 (citing *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. at 1872–73); *see also North Penn Gas,* 897 F.2d at 690 n. 2; *Database America,* 825 F.Supp. at 1209; *Apollo,* 805 F.Supp. at 1182. To establish general jurisdiction, a plaintiff must show significantly more than mere minimum contacts; the defendant's contacts to the forum must be "continuous and substantial." *Provident Nat'l Bank,* 819 F.2d at 437 (citing

*Gehling,* 773 F.2d at 541); *see also North Penn Gas,* 897 F.2d at 690 n. 2 (same); *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas,* 675 F.2d 587, 589 (3d Cir.1982).

Exton argues Our Farm is subject to general jurisdiction in New Jersey. Opposition Brief at 3–6. Exton predicates his assertion of general jurisdiction on the racing of horses by Our Farm at New Jersey tracks, its advertising in magazines which "can reasonably be expected to generate New Jersey business" and its business dealings with New Jersey residents such as Lopez. Opposition Brief at 5. According to Exton: "These facts demonstrate a systematic series of contacts concerning both the running and boarding of horses that the defendant has in New Jersey." *Id.* Exton concludes: "Our Farms (sic) should have reasonably anticipated being sued in New Jersey in connection with its many activities that have an impact here." *Id.* at 6 (citing *World–Wide Volkswagen,* 444 U.S. 286, 100 S.Ct. 559).

Our Farm appears to lack the "continuous and substantial" contacts with New Jersey necessary for Exton to establish general jurisdiction. Our Farm is a Pennsylvania corporation; its only facility is located in Pennsylvania. *Id.* "Our Farm has no offices, employees, real or personal property in New Jersey." Gambone Aff., ¶ 6. Our Farm "does not regularly conduct business, conduct services or receive revenues from business activities in New Jersey." Gambone Aff., ¶ 7.

The most significant connection Exton established between Our Farm and the forum is the occasional presence of Our Farm's racehorses in New Jersey and the periodic business Our Farm conducts with New Jersey trainers. Exton Decl., ¶¶ 3, 5–7. Such sporadic contacts with New Jersey do not permit the exercise of general jurisdiction over Our Farm. *See e.g., Helicopteros,* 466 U.S. at 408, 104 S.Ct. at 1868; *Mellon Bank,* 983 F.2d at 554; *Dent v. Cunningham,* 786 F.2d 173, 175 (3d Cir.1986); *Gehling,* 773 F.2d at 544; *Romero,* 834 F.Supp. at 682.

In *Helicopteros,* the nonresident defendant solicited helicopter services, negotiated contracts and purchased about 80% of its helicopters in Texas. 466 U.S. at 410–11, 104 S.Ct. at 1870–71. The defendant had spent approximately four million dollars over an eight-year period on parts and accessories purchased from a company in Texas and regularly sent employees to Texas for training. *Id.* Despite these contacts, the Court held the activities of the defendant were not sufficiently "continuous and systematic" to confer general jurisdiction. *Id.* at 416, 104 S.Ct. at 1873. As the Third Circuit in *Provident Nat'l Bank* observed: "These activities were important but were not central to the defendant's business, the provision of helicopter services for South America oil and construction companies." 819 F.2d at 438.

Similarly, Exton has not demonstrated racing horses in New Jersey or Our Farm's other activities in New Jersey are central to Our Farm's business. Our Farm runs a farm located in Pennsylvania. Gambone Aff., ¶ 4. Its business is the "boarding, breeding, training, treatment of and rehabilitation of thoroughbred, quarterhorses and other horses." *Id.,* ¶ 5. Racing horses in New Jersey does not appear central to Our Farm's business and is not sufficient to constitute "continuous and systematic" conduct. *See Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873; *Dent,* 786 F.2d at 175 (no general jurisdiction in New Jersey where auto accident occurred in California although defendant often visited New Jersey); *Gehling,* 773 F.2d at 544.

In *Gehling,* the Third Circuit held general jurisdiction was not established in Pennsylvania over a foreign medical college that advertised in non-forum newspapers circulated within the forum and drew six percent of its student body from the forum's residents. 773 F.2d at 541–42. General Jurisdiction was not found even though the school received "several hundred thousand dollars" annually from Pennsylvania residents and conducted a "joint international program" with a Pennsylvania college. *Id.* at 541–42. The *Gehling* court observed: "Advanced educational institutions typically draw their student body from numerous states, and appellants' theory would subject them to suit on non-forum related claims in every state where a member of the student body re-

sides." *Id.* at 542. Similarly, accepting Exton's general jurisdiction argument would expose Our Farm to suit in each state where it races horses.

The facts of the instant case demonstrate the absence of "continuous and substantial" contacts necessary to establish general jurisdiction over Our Farm. *See e.g., Romero,* 834 F.Supp. 673, 680 (D.N.J.1993) (no general jurisdiction over defendant with "little if any contact with the State of New Jersey"); *Database,* 825 F.Supp. at 1212 (no general jurisdiction over defendant that "does not maintain a continuous and substantial presence in New Jersey"). Accordingly, general jurisdiction is absent.

### B. *Transfer of Action*

Pursuant to 28 U.S.C. § 1631 ("Section 1631"), where "the court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer [the] action ... to any other such court in which the action ... could have been brought...." *Id.* The Third Circuit has stated that "a district court lacking personal jurisdiction can transfer a case to a district in which the case could have been brought originally." *Gehling,* 773 F.2d at 544 (3d Cir.1985); *see Moravian Sch. Advisory Bd. of St. Thomas v. Rawlins,* 70 F.3d 270, 274 (3d Cir.1995); *Reyno v. Piper Aircraft Co.,* 630 F.2d 149, 164–65 (3d Cir.1980), *rev'd on other grounds,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1982); *United States v. Berkowitz,* 328 F.2d 358, 361 (3d Cir.), *cert. denied,* 379 U.S. 821, 85 S.Ct. 42, 13 L.Ed.2d 32 (1964); *Romero,* 834 F.Supp. at 682; *see also Henderson v. U.S.,* —— U.S. ——, ——, 116 S.Ct. 1638, 1644, 134 L.Ed.2d 880 (1996). "Section 1631 is an efficiency-oriented provision that governs the transfers of cases between federal courts." *Rawlins,* 70 F.3d at 277 (Becker, J., concurring and dissenting). Without question, personal jurisdiction exists over Our Farm in Pennsylvania where it resides and where the events giving rise to the instant case occurred.

Faced with the choice of dismissing the instant action for lack of personal jurisdiction or transferring the case to the Eastern District of Pennsylvania, the "interests of justice" dictate transfer is appropriate pursuant to Section 1631. *See Goldlawr v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 915, 8 L.Ed.2d 39 (1962) (discussing transfer pursuant to 28 U.S.C. § 1406(a)); *Romero,* 834 F.Supp. at 682. Accordingly, this action will be transferred to the U.S. District Court for the Eastern District of Pennsylvania, pursuant to Section 1631.[4]

### *Conclusion*

For the reasons stated, this matter is transferred to the U.S. District Court for the Eastern District of Pennsylvania pursuant to Section 1631.

---

4. Because the instant action is transferred for lack of personal jurisdiction pursuant to Section 1631, it is not necessary to reach Our Farm's arguments the action should be dismissed or transferred because venue is improper in the District of New Jersey.